**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION**

GREGORY GENE BRISCOE, et al.,    §
       §
     Plaintiffs,      §
       §      CIVIL ACTION NO. 4:23-CV-00260-
v.                  §           ALM-AGD
       §
JAGUAR LAND ROVER NORTH    §
AMERICA,                §
       §
     Defendant.      §

**REPORT AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE**

The above-referenced case was referred to the undersigned United States Magistrate Judge for pre-trial purposes in accordance with 28 U.S.C. § 636. Pending before the court is Defendant Jaguar Land Rover North America's ("Defendant") Motion for Judgment on the Pleadings (Dkt. #21) and Defendant's Motion for Summary Judgment (Dkt. #29). Having reviewed Defendant's Motion for Judgment on the Pleadings, Gregrey Gene Briscoe[1] and Lori Smith's ("Plaintiffs") Response (Dkt. #26), Defendant's Motion for Summary Judgment, Plaintiffs' Response (Dkt. #30), Defendant's Reply (Dkt. #31), Plaintiffs' Sur-Reply (Dkt. #33), and all other relevant pleadings, the court finds that Defendant's Motion for Judgment on the Pleadings (Dkt. #21) should be denied as moot and Defendant's Motion for Summary Judgment (Dkt. #29) should be granted in part and denied in part as discussed herein.

---

[1] Plaintiff Gregrey Gene Briscoe's name is misspelled as Gregory in the caption of the case. The court uses the spelling from Plaintiffs' Unsworn Declaration of Gregrey Gene Briscoe. *See* Dkt. #30, Exhibit A.

REPORT AND RECOMMENDATION

# BACKGROUND

*Factual History*

On December 28, 2016, Plaintiffs purchased a 2017 Jaguar F-Pace 3 for the purchase price of $59,943.42 (the "Vehicle") (Dkt. #14 at p. 3). Included with the purchase of the Vehicle, Plaintiffs received a Jaguar Elite Care, 5-year, 60,000-mile, bumper-to-bumper and drive-train warranty (Dkt. #14 at p. 3). Over four years later, on March 28, 2021, while Plaintiff Lori Smith was traveling out of state, the Vehicle experienced a total loss of power and came to a complete stop (Dkt. #14 at p. 3). The Vehicle then flashed multiple error codes on the dashboard (Dkt. #14 at pp. 3–4). At the time of the power failure, the Vehicle's odometer read 28,519 miles, and Plaintiffs had nine months left on the Jaguar Elite Care warranty (Dkt. #14 at p. 4). Per the warranty, the Vehicle was towed from Columbus, Mississippi to Land Rover Birmingham in Irondale, Alabama (the "Facility") at Defendant's expense (Dkt. #14 at p. 4; Dkt. #29 at p. 5). The Facility performed repair work and returned the Vehicle to Plaintiff Lori Smith at her mother's house in Columbus, Mississippi on April 2 or April 3, 2021 (Dkt. #14 at p. 5; Dkt. #29 at p. 5). After the Vehicle immediately experienced the same or similar issues, the Vehicle was towed back to the Facility, again at Defendant's expense, on April 29, 2021 (Dkt. #14 at p. 5; Dkt. #29 at p. 5). Upon the Vehicle's return to the Facility, a reinspection of the Vehicle revealed multiple error codes (Dkt. #14 at p. 5). During the second repair process, the Facility inspected the Vehicle multiple times, each time finding and repairing new error codes (Dkt. #14 at pp. 5–6). Plaintiffs made multiple calls for status updates during the second repair process (Dkt. #14 at p. 6).

While the Vehicle was at the Facility undergoing repair work, Plaintiffs filed a claim with the Better Business Bureau Autoline alternative dispute program (Dkt. #29 at p. 5). Then, on

REPORT AND RECOMMENDATION – Page 2

May 20, 2021, Plaintiffs' attorney sent a demand letter to Defendant insisting that Defendant "immediately cease and desist all communications with [Plaintiffs]" unless related to future repairs (Dkt. #29 at p. 6). About a month later, on or about June 15, 2021, Plaintiffs filed a Lemon Law action with the Texas Motor Vehicle Department, which was subsequently dismissed (Dkt. #14 at pp. 7–8; Dkt. #29 at p. 6). On June 21, 2021, the Facility reported to Plaintiffs that the Vehicle was ready for pickup (Dkt. #14 at p. 6; Dkt. #29 at p. 6). Plaintiff Lori Smith traveled to the Facility to pick up the Vehicle, but stated that the Vehicle made strange noises, and Plaintiff Lori Smith insisted that the Vehicle was not repaired and that she would not accept the Vehicle (Dkt. #14 at p. 6; Dkt. #29 at p. 6). On September 28, 2021, the Facility sent a certified letter to Plaintiffs stating that the Vehicle has been ready for pickup for several months, and that if Plaintiffs did not retrieve the Vehicle, it would be processed as abandoned and sold at auction (Dkt. #29 at p. 6).

On November 22, 2021, counsel for Plaintiffs sent another demand letter to Defendant instructing Defendant to cease contact with Plaintiffs and only communicate through Plaintiffs' counsel (Dkt. #29 at p. 7). As with the first demand letter, this demand letter stated that Plaintiff Gregrey Gene Briscoe "was revoking acceptance" of the Vehicle (Dkt. #29 at p. 7).

***Procedural History***

On March 28, 2023, two years after Plaintiffs experienced the initial issues with the Vehicle, Plaintiffs filed the instant lawsuit against Defendant (Dkt. #1; Dkt. #29 at p. 7). Plaintiffs allege in their Amended Complaint that Defendant breached an express warranty in violation of the Magnuson Moss Warranty Act ("MMWA"), violated the Texas Deceptive Trade Practices – Consumer Protection Act ("DTPA") in various ways, committed common law fraud, and committed breach of contract and breach of warranty (Dkt. #14 at pp. 9–11). On December

6, 2023, Defendant filed a Motion for Judgment on the Pleadings and Motion to Dismiss Certain Claims under 12(c) and 9(b) (Dkt. #21). Defendant's Motion for Judgment on the Pleadings moved to dismiss Plaintiffs' causes of action for DTPA unconscionable action or course of conduct, DTPA implied warranty of good and workmanlike repair, and common law fraud (Dkt. #21 at p. 1).[2] On December 27, 2023, Plaintiffs filed their Response (Dkt. #26).

On January 26, 2024, Defendant filed its Motion for Summary Judgment seeking judgment on Plaintiffs' claims for breach of express warranty under the MMWA and DTPA, claim for breach of implied warranty of merchantability under the DTPA, claim for breach of implied warranty of good and workmanlike repair under the DTPA, claim for unconscionable action or course of action under the DTPA, claims for common law fraud, claims for monetary damages, and "vague claim of agency." (Dkt. #29 at pp. 2–3). Plaintiffs filed their Response (Dkt. #30) on February 16, 2024, Defendant filed its Reply (Dkt. #31) on February 23, 2024, and Plaintiffs filed their Sur-Reply (Dkt. #33) on March 1, 2024. On February 23, 2024, Defendant filed objections to some of Plaintiffs' summary judgment evidence (Dkt. #32), and on March 4, 2024, Defendant filed objections to the evidence attached to Plaintiffs' Sur-Reply (Dkt. #34). On March 13, 2024, Plaintiffs filed responses to Defendant's objections (Dkt. #35; Dkt. #36).[3]

## LEGAL STANDARD

The purpose of summary judgment is to isolate and dispose of factually unsupported claims or defenses to help "secure the just, speedy and inexpensive determination of every action." *Nat'l Cas. Co. v. Kiva Const. & Eng'g, Inc.*, 496 Fed. App'x 446, 449 (5th Cir. 2012) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986)). Summary judgment is proper if the

---

[2] Because Defendant raises the same issues in its Motion for Summary Judgment, the court recommends denying as moot Defendant's Motion for Judgment on the Pleadings and Motion to Dismiss Certain Claims under Rule 12(c) and 9(b) (Dkt. #21).

[3] Since the court did not rely on evidence that was objectionable, the court need not consider Defendant's objections to Plaintiffs' evidence.

pleadings, the discovery and disclosure materials on file, and any affidavits "[show] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "A genuine dispute of material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Certain Underwriters at Lloyd's, London v. Axon Pressure Prod. Inc.*, 951 F.3d 248, 255 (5th Cir. 2020) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). All inferences must be construed in the light most favorable to the nonmoving party. *See id.*; *Osprey Ship Mgmt. Inc. v. Foster*, 387 Fed. App'x 425, 429 (5th Cir. 2010). "[T]he substantive law will identify which facts are material. This means [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Gibson v. Collier*, 920 F.3d 212, 219 (5th Cir.), *cert. denied*, 140 S. Ct. 653 (2019) (citing *Parrish v. Premier Directional Drilling, L.P.*, 917 F.3d 369, 378 (5th Cir. 2019)) (internal quotations omitted).

The party moving for summary judgment has the burden of showing that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law. *Cotroneo v. Shaw Env't & Infrastructure, Inc.*, 639 F.3d 186, 191 (5th Cir. 2011). "[W]here the movant bears the burden of proof at trial, the movant 'must establish beyond peradventure all of the essential elements of the claim or defense to warrant judgment in his favor.'" *Lyons v. Katy Indep. Sch. Dist.*, 964 F.3d 298, 302 (5th Cir. 2020) (citation omitted). However, if the movant does not bear the burden of proof at trial, the movant is entitled to summary judgment if "the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Gonzales v. ConocoPhillips Co.*, 806 Fed. App'x 289, 291 (5th Cir. 2020) (citing *Celotex*, 477 U.S. at 323). Once the movant has carried its burden, the nonmovant "must go beyond the pleadings and identify specific evidence in the

record showing that there is a genuine issue for trial." *Powers v. Northside Indep. Sch. Dist.*, 951 F.3d 298, 307 (5th Cir. 2020). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Malbrough v. Stelly*, 814 Fed. App'x 798, 802 (5th Cir. 2020) (citing *Anderson*, 477 U.S. at 249-50).

## ANALYSIS

### A. Breach of Express Warranty

Enacted in 1974, the Magnuson Moss Warranty Act ("MMWA") "creates a statutory cause of action for consumers 'damaged by the failure of a supplier, warrantor, or service contractor to comply with any obligation [imposed by the Act] or [established by] a written warranty, implied warranty, or service contract.'" *Walton v. Rose Mobile Homes, LLC*, 298 F.3d 470, 474 (5th Cir. 2002) (citing 15 U.S.C. § 2310(d)(1)). (Alterations in original). "The MMWA does not provide an independent basis for liability, but instead provides a federal cause of action for state law express and implied warranty claims." *Taliaferro v. Samsung Telecomms. Am., LLC*, No. 3:11-cv-1119-D, 2012 WL 169704, at *10 (N.D. Tex. Jan. 19, 2012) (internal quotation marks and citations omitted). Similarly, the Texas Deceptive Trade Practices Act ("DTPA") provides a mechanism by which parties may enforce express and implied warranties. *Tsao v. Ferring Pharms., Inc.*, No. 4:16-cv-01724, 2017 WL 746451, at *6 (S.D. Tex. Jan. 4, 2017) ("Although the DTPA allows a consumer to pursue a breach of warranty claim, the act itself does not create any warranties. It merely codifies provisions of the UCC and provides for additional remedies."). Thus, Plaintiffs' MMWA and DTPA claims hinge upon their state law claims for breach of warranty.

To establish breach of an express warranty,

Plaintiff 'must allege (1) an express affirmation of fact or promise by the seller relating the goods; (2) that such affirmation of fact or promise by the seller

became a part of the basis of the bargain; (3) that [Plaintiff] relied upon said affirmation of fact or promise; (4) that the goods failed to comply with the affirmation of fact or promise; (5) [Plaintiff] [was] injured by such failure of the product to comply with the express warranty; and (6) that such failure was the proximate cause of [Plaintiff's] injury.'

*Harris v. BMW of N. Am., LLC*, No. 4:19-cv-00016, 2020 WL 7081808, at *5 (E.D. Tex. Dec. 3, 2020) (quoting *Johnson v. Philip Morris*, 159 F. Supp. 2d 950, 952 (S.D. Tex. 2001)); *see also* TEX. BUS. & COM. CODE § 2.313(a)(1). The parties do not dispute the first three elements; that is, that an express warranty exists that was part of the basis of the bargain and relied upon by Plaintiffs. Where the parties differ is the last three elements; that is, whether the express warranty was breached, proximately causing injury to Plaintiffs. Defendant raises three issues under Plaintiffs' alleged breach of express warranty claims: (1) whether the Vehicle was properly repaired under the warranty; (2) whether Defendant breached the express warranty when it did not transport the Vehicle to Texas; and (3) whether Plaintiffs were entitled to trip interruption benefits under the express warranty.

### 1.  *Repair of the Vehicle*

During the 5-year, 60,000-mile period, Defendant warranted the Vehicle as follows:

Jaguar warrants that during the warranty period, if a 2017 Model Year Jaguar vehicle is properly operated and maintained, repairs required to correct defects in factory-supplied materials or factory workmanship will be performed without charge upon presentment for service at an authorized Jaguar retailer; any component covered by this warranty found to be defective in materials or workmanship will be repaired, or replaced, without charge, with a new or remanufactured part distributed by Jaguar, at its sole option.

(Dkt. #29 at p. 4).

Defendant claims summary judgment is proper on Plaintiffs' express warranty claim because the Vehicle was repaired, without charge, under the warranty (Dkt. #29 at p. 10). For this assertion, Defendant relies on its expert's affidavit (Dkt. #29, Exhibit C). Defendant's expert, Brandon Sangster, averred: "The documented concerns or issues for which the subject

vehicle was presented to the Alabama dealership were repaired under the new vehicle limited warranty and at no charge to the owner." (Dkt. #29, Exhibit C at ¶ 22). The Facility sent a certified letter to Plaintiffs on September 28, 2021, stating that "[a]ll the agreed upon work has been completed and your vehicle has been ready for pick-up since June 24, 2021." (Dkt. #29, Exhibit J). Accordingly, Defendant has produced evidence to support its theory that no breach of express warranty occurred with regard to repair of the Vehicle.

Plaintiffs, however, insist that the Vehicle was not repaired as required under the express warranty. Initially, when the Vehicle was returned to Plaintiffs in early April 2021, the Vehicle immediately presented with the same or similar issues and was towed back to the Facility. It is undisputed that the Vehicle was not repaired at that time. However, the Facility continued working on repairing the Vehicle. Among other issues, the Vehicle needed a new engine wiring harness, which had to be ordered from the United Kingdom (Dkt. #29, Exhibit C at ¶¶ 7–9). The procurement of the harness took longer than usual due to the Covid-19 pandemic and the related supply-chain issues (Dkt. #29 at p. 6) ("While this custom-made harness is difficult enough to obtain in ordinary times, this dealer was trying to source the part during supply challenges created by the world-wide Covid-19 pandemic."). However, once acquired, the Facility replaced the harness, performed test drives, and made specific repairs. Mr. Sangster averred:

> Another test drive was performed, where the check engine light came on due to a P2096-02 DCT being stored. An inspection of the work previously performed was carried out and found to be sound with no damage. The code was deemed to be the result of a faulty oxygen sensor, which was replaced. A final test drive for this concern was carried out with the concern being fully rectified and no longer present at that time.

(Dkt. #29, Exhibit C at ¶ 9). Mr. Sangster ultimately concluded that all issues identified "were repaired under the new vehicle limited warranty and at no charge to the owner." (Dkt. #29, Exhibit C at ¶ 22).

REPORT AND RECOMMENDATION – Page 8

Plaintiffs presented no evidence to the contrary in their Response. Instead, Plaintiffs allege the Vehicle was not repaired under the warranty because upon Plaintiff Lori Smith's arrival to pick up the Vehicle in June 2021, "the vehicle made an alarming noise when Plaintiff Lori turned the vehicle on." (Dkt. #30 at p. 7). Rather than inspect the Vehicle and include an expert report, Plaintiffs rely on Plaintiff Lori Smith's observations to assert that there is a fact question whether the Facility replaced the defective engine wiring harness with "an ill-fitting engine harness" and whether the Vehicle was repaired when it made "alarming noises" after being "reported as ready for pick-up on or about June 21, 2021." (Dkt. #30 at pp. 6–7).

In order to prove that the Vehicle was, in fact, not repaired under the warranty, expert testimony is required. *See Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 583 (Tex. 2006) ("Expert testimony is required when an issue involves matters beyond jurors' common understanding.") (citing *Alexander v. Turtur & Assocs.*, 146 S.W.3d 113, 119–20 (Tex.2004)); *see also Nissan Motor Co., Ltd. v. Armstrong*, 145 S.W.3d 131, 137 (Tex. 2004) (holding that a plaintiff's lay testimony "was not enough . . . [i]nstead, we have consistently required competent expert testimony and objective proof that a defect caused the [complained-of issue].").

Here, Plaintiffs failed to designate an expert, and therefore do not have expert testimony stating that the Vehicle had not been properly repaired. However, based on Plaintiff Lori Smith's experience with the Vehicle on or about June 25, 2021, the Vehicle appeared to exhibit issues leading to "alarming noises," and Defendant's expert report illustrates how more error codes were discovered upon inspection in October 2023. Construing these facts in the light most favorable to Plaintiffs, a fact question remains as to whether the Vehicle was repaired under the

REPORT AND RECOMMENDATION – Page 9

warranty in June 2021.[4] Thus, summary judgment is improper on Plaintiffs' breach of express warranty claims under the MMWA and the DTPA.

### 2. *Towing the Vehicle*

Defendant raises the issue of whether there was a breach of the express warranty when Defendant did not tow the Vehicle to Texas, but rather towed the Vehicle to the nearest dealership: the Facility in Alabama (Dkt. #29 at p. 12). Plaintiffs, however, do not raise this issue under breach of express warranty. Instead, Plaintiffs raised this as a claim for fraud. However, "out of an abundance of caution" Defendant addressed this claim to the extent it may apply to the breach of express warranty (Dkt. #29 at p. 12, n.5).

The express warranty afforded a towing benefit as follows: "In the event of a mechanical disablement of your Jaguar vehicle which renders the vehicle inoperative, the Jaguar Assistance Center will arrange to transport your vehicle *to the nearest Jaguar retailer*. This service will be provided . . . at no cost to you." (Dkt. #29, Exhibit B at p. 30) (emphasis added). It is undisputed that the Vehicle was towed to the nearest Jaguar dealership from Columbus, Mississippi, where Plaintiff Lori Smith experienced the mechanical disablement (Dkt. #14 at pp. 4–5; Dkt. #29 at pp. 12–13). The Vehicle was towed to the Facility, then to Plaintiff Lori Smith's mother's house, and back to the Facility, each time at no cost to Plaintiffs. As such, there is no genuine dispute of material fact that the express warranty was not breached in relation to the towing of the Vehicle. Accordingly, to the extent it was raised, Defendant is entitled to summary judgment on this element of alleged breach of express warranty.

---

[4] While Plaintiffs may have raised a fact question at this stage in the litigation, it is unclear how Plaintiffs will be able to establish at trial that the Vehicle was not repaired under the warranty without the testimony of an expert witness. The court makes no determination as to the ultimate viability of Plaintiffs' claim for breach of express warranty to contradict Defendant's expert.

### 3.  *Trip Interruption Benefits*

Plaintiffs argue that Defendant breached the express warranty because Defendant did not reimburse Plaintiffs for expenses incurred as a result of the Vehicle's issues. The express warranty provides as follows: "Trip interruption benefits are provided in the event of a warranty-related disablement that occurs more than 50 miles from your primary residence. Reasonable reimbursement for meals, lodging and alternate transportation expenses are included, unless you have already reached your final destination." (Dkt. #29, Exhibit B at p. 31). The warranty includes a notation that "[r]eimbursement for meals and lodging is not extended if you have already reached your final or intended destination." (Dkt. #29, Exhibit B at p. 31).

In Plaintiffs' Amended Complaint, Plaintiffs allege Plaintiff Lori Smith was in Columbus, Mississippi visiting her mother when the Vehicle experienced a total loss of power (Dkt. #14 at pp. 3, 5). Defendant argues that Plaintiffs are not entitled to trip interruption benefits because Plaintiff Lori Smith had already reached her final destination, *i.e.*, her mother's house in Columbus, Mississippi (Dkt. #29 at pp. 13–14). Plaintiffs counter this argument by asserting— for the first time—that Plaintiff Lori Smith was on her way to Pensacola, Florida and that their home in Texas was the final destination (Dkt. #30 at p. 8). ("Plaintiffs oppose Defendant's argument because Plaintiff Lori had not reached her destination, Pensacola, Florida . . . . Also, to be clear, Plaintiff Lori's final destination was her home in Texas.").

Defendant's Reply correctly asserts that prior to Plaintiffs' Response, there is no mention of a trip to Florida in any of the pleadings. The only destination mentioned is Columbus, Mississippi. However, in Plaintiffs' Sur-Reply, Plaintiffs state that Defendant "chose not to depose any of the Plaintiffs, nor any other witnesses, but if it did, it could have asked Smith about the exact reason of her travel to Mississippi, and her final destination." (Dkt. #33 at p. 4).

Construing this information in the light most favorable to Plaintiffs, a fact question exists as to whether Plaintiff Lori Smith's trip was interrupted prior to reaching her final destination. Thus, Defendant is not entitled to summary judgment on this claim.

### B. Breach of Implied Warranty of Merchantability

Texas Business and Commerce Code § 2.314 mirrors Uniform Commercial Code § 2-314 and sets out the implied warranty of merchantability. "Unless excluded or modified (Section 2.316), a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind." TEX. BUS. & COM. CODE § 2.314(a); *see also* UNIF. L. ANN. UNIF. COM. CODE § 2-314(1). To establish a breach of the implied warranty of merchantability, Plaintiffs must establish the following four elements: "(1) the defendant sold goods to the plaintiff; (2) the goods were unmerchantable when they left the manufacturer's possession; (3) the plaintiff notified the defendant of the breach; and (4) the plaintiff suffered injury." *Young v. Cutera, Inc.*, No. 4:19-cv-00388-RWS, 2021 WL 9526862, at *3 (E.D. Tex. Aug. 9, 2021). It is undisputed that the implied warranty of merchantability applies to the Vehicle. Where the parties disagree is whether the Vehicle was merchantable.

For goods to be merchantable, the goods must

(1) pass without objection in the trade under the contract description; and (2) in the case of fungible goods, are of fair average quality within the description; and (3) are fit for the ordinary purposes for which such goods are used; and (4) run, within the variations permitted by the agreement, of even kind, quality, and quantity within each unit and among all units involved; and (5) are adequately contained, packaged, and labeled as the agreement may require; and (6) conform to the promises or affirmations of fact made on the container or label if any.

TEX. BUS. & COM. CODE § 2.314(b)

Plaintiffs' Amended Complaint argues that the Vehicle was unmerchantable because it was not "fit for the ordinary purposes for which [cars] are used." (Dkt. #14 at p. 10). Defendant alleges that the Vehicle was merchantable and did not contain a defect when it was sold to

Plaintiffs (Dkt. #29 at p. 14). Yet Plaintiffs argue in their Response that the Vehicle could not pass without objection in the trade *and* that it was unfit for its ordinary purposes (Dkt. #30 at p. 9).

Plaintiffs cite Plaintiff Gregrey Gene Briscoe's Unsworn Declaration, an April 1, 2021, Invoice, a June 24, 2021, Invoice, and several photos of the dashboard error codes to establish that the Vehicle had 28,519 miles just over 4 years after Plaintiffs purchased the Vehicle (Dkt. #30, Exhibit A at ¶ 3, Exhibit C, Exhibit M). These exhibits do not establish that a defect existed when the Vehicle left Defendant's possession, nor do they establish that the Vehicle was not fit for its ordinary purpose. Rather, the evidence Plaintiffs cited establishes that Plaintiffs experienced more than four years of defect-free use of the Vehicle. In fact, Plaintiffs put nearly 30,000 miles on the Vehicle before they experienced an issue that was covered by their warranty. "If goods are defective, [a] seller may be liable for breach of an implied warranty." *Gen. Motors Corp. v. Brewer*, 966 S.W.2d 56, 57 (Tex. 1998). However, goods are not defective where "the product merely fails to fulfill the precise expectations of the consumer . . . ." *Id.* "A product which performs its ordinary function adequately does not breach the implied warranty of merchantability merely because it does not function as well as the buyer would like, or even as well as it could." *Id.* Plaintiffs cite no case law or statutory authority to the contrary. Accordingly, the court recommends that summary judgment is appropriate on Plaintiffs' claim for breach of the implied warranty of merchantability.

### C. Breach of Implied Warranty of Good and Workmanlike Performance

Texas courts have recognized an implied warranty for good and workmanlike performance. *Melody Home Mfg. Co. v. Barnes*, 741 S.W.2d 349, 354 (Tex. 1987) ("We hold that an implied warranty to repair or modify existing tangible goods or property in a good and

workmanlike manner is available to consumers suing under the DTPA."). The Texas Supreme Court "define[d] good and workmanlike as that quality of work performed by one who has the knowledge, training, or experience necessary for the successful practice of a trade or occupation and performed in a manner generally considered proficient by those capable of judging such work." *Id.* (collecting cases). The Texas Supreme Court further explained that it "do[es] not require repairmen to guarantee the *results* of their work; [it] only require[s] those who repair or modify existing tangible goods or property to *perform* those services in a good and workmanlike manner." *Id.* (emphasis in original).

Plaintiffs raise issues that the Vehicle was not fully repaired in April 2021, that the Vehicle was not repaired in June 2021, and that to date, the Vehicle is still not operable in its current state (Dkt. #30 at pp. 11–13). These assertions are based on additional mechanical issues discovered each time the Facility or Defendant's expert ran diagnostic tests on the Vehicle. Plaintiffs rely on these newly discovered issues to state that the technicians did not repair the Vehicle in a good and workmanlike manner. Such assertions run afoul of the standard. As *Melody Home Mfg. Co.* stated, the implied warranty of good and workmanlike performance does not guarantee *results*; it guarantees good and workmanlike *performance*. 741 S.W.2d at 354. Here, Plaintiffs complain of the results of the repairs. Plaintiffs have presented no evidence to support the assertion that the repairs were not performed in a good and workmanlike manner.

Plaintiffs state that the Facility does not know what repairs were done in April 2021 and cite an email from Joel Spanick, a Service Advisor for the Facility (Dkt. #30, Exhibit E at p. PLF 0038). Mr. Spanick stated that (1) he does not have an explanation why one electrical issue was not discovered in April 2021, but that the Vehicle is "very complex"; (2) he did not know why certain notes were not included on the repair order, but the work performed was found in the

technician's notes that would normally be sent to the customer for approval, but not in this case since the issue was covered under the warranty; and (3) he could not explain why a repair order was documented incorrectly because he was not the advisor for the Vehicle at that time (Dkt. #30, Exhibit E at p. PLF 0038). This email contains several admissions, but none of Mr. Spanick's statements above demonstrate that the Facility did not know which repairs were performed.

Plaintiffs also make the conclusory assertion that because the Facility did not discover a coolant leak during the initial repair in April 2021, the Facility did not perform the services in a good and workmanlike manner (Dkt. #30 at p. 12). Plaintiffs do not cite any authority to support such assertion. And again, Plaintiffs are complaining of the results of the initial repair, not the manner in which the work was performed. Additionally, Plaintiffs assert that the services rendered were not performed in a good and workmanlike manner because the Vehicle, upon inspection in October 2023, revealed more error codes and was inoperable due to a dead battery (Dkt. #30 at pp. 12–13). Plaintiffs' assertions fail to account for the more than two years that the Vehicle sat on the Facility's lot after being reported as repaired in June 2021.

Regardless, Plaintiffs' assertions that the implied warranty for good and workmanlike performance was breached requires expert testimony. "[G]ood and workmanlike [is defined] as that quality of work performed by one who has the knowledge, training, or experience necessary for the successful practice of a trade or occupation and *performed in a manner generally considered proficient by those capable of judging such work*." *Melody Home Mfg. Co.*, 741 S.W.2d at 354 (emphasis added); *see also id.* (finding that expert testimony is not required where "the breach of the implied warranty was plainly within the common knowledge of laymen"). As Defendant argues, "[t]he techniques and methods employed by the service technician to examine,

REPORT AND RECOMMENDATION – Page 15

diagnose, and repair a complex luxury vehicle are not 'plainly' within a layperson's knowledge." (Dkt. #29 at p. 17).

The only expert opinion regarding the performance of the repairs of the Vehicle was provided by Defendant's expert. Mr. Sangster averred, "It is not unusual, or below industry custom or standards, for a technician to diagnose and repair a vehicle issue, verifying it with a test drive, and then have the same or similar issue later re-appear, requiring further diagnosis and repair." (Dkt. #29, Exhibit C at ¶ 21). Mr. Sangster concluded, "The repair procedure, methods, and length of time for repair by the dealer were reasonable and customary for the industry and circumstances." (Dkt. #29, Exhibit C at ¶ 22). For the foregoing reasons, the court recommends granting summary judgment on Plaintiffs' claim for breach of the implied warranty of good and workmanlike performance.

Additionally, Texas courts have held that "implied warranties that 'services will be performed in a good and workmanlike manner' usually 'arise [only] under the common law when public policy mandates [such].'" *Dizdarevic v. Goodyear Tire & Rubber Co.*, No. 4:19-CV-0963, 2020 WL 3513255, at *3 (S.D. Tex. Apr. 22, 2020) (quoting *Shakeri v. ADT Sec. Servs., Inc.*, 816 F.3d 283, 294 (5th Cir. 2016)). "The Supreme Court of Texas has clarified that [p]ublic policy does not justify imposing an implied warranty for service transactions in the absence of a demonstrated, compelling need and [t]here is no compelling need for an implied warranty when other adequate remedies are available to the consumer." *Dizdarevic*, 2020 WL 3513255, at *3 (internal quotation marks and citations omitted). Here, the court recommends that several of Plaintiffs' claims for the breach of express warranty under the MMWA and DTPA should survive summary judgment. Thus, other adequate remedies are available to Plaintiffs, and Texas courts would not impose an implied warranty in the present case. *See Shakeri*, 816 F.3d at

REPORT AND RECOMMENDATION – Page 16

295 ("Because Plaintiffs have adequate remedies for ADT's conduct in both their negligence and breach of contract causes of action, Texas courts would not recognize an implied warranty in ADT's repair and modification of the alarm system."). Accordingly, the court recommends summary judgment on Plaintiffs' claim for breach of the implied warranty of good and workmanlike performance.

### D. Breach of Contract

Plaintiffs' Amended Complaint alleges "Breach of Contract/Breach of Warranty (Texas)" as another cause of action (Dkt. #14 at p. 11). Other than incorporating preceding paragraphs of the Amended Complaint, Plaintiffs do not plead the elements of breach of contract nor any facts that would support such a claim. Rather, Plaintiffs claim that the incorporated paragraphs "constitute a breach of warranty, which proximately caused the direct and consequential damages of Plaintiffs." (Dkt. #14 at p. 11). Defendant disputes this breach of contract claim because Defendant and Plaintiffs do not have a contract within the common law meaning (Dkt. #29 at p. 18). Additionally, Defendant disputes this claim "because the underlying transaction involved the sale of goods, which means the transaction is governed by the Texas Uniform Commercial Code (UCC)." (Dkt. #29 at p. 18).

"Texas has adopted the Uniform Commercial Code (UCC) in its Business and Commerce Code." *Coim USA, Inc. v. Sjobrand, Inc.*, 663 F. Supp. 3d 684, 688 (N.D. Tex 2023) (citing TEX. BUS. & COM. CODE § 2.102 *et seq.*). "[W]hen parties enter into a contract for the sale of goods, Chapter 2 of the Texas Business and Commerce Code controls the conduct of the parties." *Id.* (internal quotation marks and citations omitted). "Where the U.C.C. applies, it displaces all common law rules . . . regarding breach of contract and substitutes instead those rules of law and procedure set forth in the U.C.C." *Id.* (internal quotation marks and citation omitted).

Plaintiffs do not discuss the breach of contract claim in their Response to Defendant's Motion for Summary Judgment, so the court presumes Plaintiffs do not oppose Defendant's position. LOCAL RULE CV-7(d) ("[A response] shall contain a concise statement of the reasons in opposition to the motion and a citation of authorities upon which the party relies. A party's failure to oppose a motion in the manner prescribed herein creates a presumption that the party does not controvert the facts set out by movant and has no evidence to offer in opposition to the motion."). Accordingly, the court recommends that summary judgment is proper on Plaintiffs' breach of contract claim.

### E. DTPA Claim for Unconscionable Action or Course of Action

"The DTPA creates a cause of action for consumers based on '(1) the use of or employment of a false, misleading, or deceptive act or practice that is included in the "laundry list" of violations under section 17.46(b), (2) the breach of any express or implied warranty, and (3) an unconscionable action or course of action.'" *Franklin v. Apple, Inc.*, 569 F. Supp. 3d 465, 478 (E.D. Tex. 2021) (quoting *Int'l Med. Ctr. Enters., Inc. v. ScoNet, Inc.*, No. 01-16-00357-CV, 2017 WL 4820347, at *7 (Tex. App—Houston [1st Dist.] Oct. 26, 2017)). To establish a claim under the DTPA for unconscionable action or course of action, Plaintiff must show that Defendant engaged in "an act or practice which, to a consumer's detriment, takes advantage of the lack of knowledge, ability, experience, or capacity of the consumer to a grossly unfair degree." TEX. BUS. & COM. CODE § 17.45(5).

Plaintiffs' Amended Complaint fails to plead with any particularity how Defendant engaged in unconscionable acts. Plaintiffs' threadbare assertion is merely a recital of the elements (Dkt. #14 at p. 10). ("Defendant and Defendant's authorized agents and representatives engaged in an 'unconscionable action or course of action' to the detriment of Plaintiffs as that

term is defined by Section 17.45(5) of the Texas Business and Commerce Code, by taking advantage of the lack of knowledge, ability, experience, or capacity of Plaintiff[s] to a grossly unfair degree."). Defendant's Motion for Summary Judgment argues that such claim fails because "(1) there is no evidence to support [the claim], and (2) the claim is really just a mere breach of warranty claim and not actionable under this provision of the DTPA." (Dkt. #29 at pp. 18–19). Plaintiffs' Response alleges that Plaintiff Lori Smith was told (by an unidentified person) that the Vehicle would be towed to Texas once repaired (Dkt. #30 at p. 15). Plaintiffs also allege in their Response that the Vehicle was not properly repaired by June 2021 when the Facility reported the Vehicle as ready for pickup (Dkt. #30 at pp. 15–16). Plaintiffs further allege that the Vehicle "remains improperly repaired today, almost three years later." (Dkt. #30 at p. 16). Finally, Plaintiffs allege that Defendant took advantage of their "lack of knowledge, experience, and capacity to adequately repair the vehicle themselves, to a grossly unfair degree." (Dkt. #30 at p. 17). Plaintiffs conclude that the foregoing illustrates that a genuine dispute of material fact exists in three ways:

> (1) Whether the vehicle's defect was corrected before it was reported as ready for pick-up on or about June 21, 2021, *in fulfilment of the warranty*, by replacing its defective engine harness with an ill-fitting engine harness; (2) whether the vehicle's defect was corrected before it was reported as ready for pick-up on or about June 21, 2021, *in fulfilment of the warranty*, when the vehicle's alarming noises pierced the air; and (3) whether the vehicle's defect was corrected before it was reported as ready for pick-up on or about June 21, 2021, *in fulfilment of the warranty*, when the vehicle's battery failed to be addressed.

(Dkt. #30 at p. 17) (emphasis added).

As stated by Plaintiffs, each of the identified alleged genuine disputes of material fact relate to whether the Facility repaired the Vehicle "in fulfilment of the warranty." These three alleged disputes of material fact do not, however, relate to whether Defendant took advantage of Plaintiffs' lack of knowledge, ability, experience, or capacity to adequately repair the Vehicle

themselves, to a grossly unfair degree. Instead, each instance, if proven to be in Plaintiffs' favor by a factfinder, would result in a breach of the express warranty. Thus, such breach would not be actionable under this section of the DTPA.

Defendant also argues that Plaintiffs were not taken advantage of to an unfair degree because they were represented by counsel as of May 2021. In support of this assertion, Defendant relies on *Head v. U.S. Inspect DFW, Inc.*, 159 S.W.3d 731, 745 (Tex. App.—Fort Worth, Feb. 24, 2005). Representation of counsel was not what led the court to determine that unconscionable actions did not occur. The court found that along with the representation of counsel, the plaintiff contacted a company following a "glowing recommendation" from a realty company, the plaintiff had the option of selecting another company, and the plaintiff, or her representatives, obtained four separate home inspections before the plaintiff purchased the home. *Head*, 159 S.W.3d at 745. As such, here, the fact that Plaintiffs were represented by counsel during the repairs is not a dispositive factor, but one to be considered. The court notes that unlike in *Head*, Plaintiffs did not have options for where to take the Vehicle, and Plaintiffs did not select the Facility on a "glowing recommendation." So, the court finds *Head* to be inapposite to the present case.

However, "[a]n allegation of a mere breach of contract, without more, does not constitute a 'false, misleading or deceptive act' in violation of the DTPA." *Ashford Dev., Inc. v. USLife Real Estate Servs. Corp.*, 661 S.W.2d 933, 935 (Tex. 1983) (internal quotation marks and citations omitted). "Instead, . . . the inquiry is whether the alleged unconscionable conduct 'could have resulted in the absence of a contract between the parties.'" *Shakeri*, 816 F.3d at 295 (quoting *Crawford v. Ace Sign, Inc.*, 917 S.W.2d 12, 13 (Tex. 1996)). "Interpreting Texas law, [the Fifth Circuit has] stated that where 'allegedly unconscionable statements' are made but

REPORT AND RECOMMENDATION – Page 20

where the breach of the contract causes the harm, a plaintiff cannot maintain a claim for unconscionable conduct under the DTPA." *Id.* (citing *Malsom v. Match.com, L.L.C.*, 540 Fed. App'x 412, 415 (5th Cir. 2013) (unreported)).

Here, Plaintiffs would not have a claim against Defendant if there was no express warranty. The harm suffered by Plaintiffs as a result of the alleged unconscionable actions is based on the assertion that the Vehicle was not repaired and that the Vehicle was not towed to Texas. The repairs were being performed under the express warranty and the Vehicle was towed under the express warranty. Thus, any damages arising out of those transactions would be based on an alleged breach of the express warranty. Accordingly, Plaintiffs cannot maintain a claim for unconscionable acts under the DTPA. Thus, the court recommends that summary judgment be granted on this claim.

### F. Common Law Fraud

In Texas courts, to establish a fraud claim, Plaintiffs must show:

"(1) [Defendant] made a material representation that was false; (2) it knew the representation was false or made it recklessly as a positive assertion without any knowledge of its truth; (3) it intended to induce [Plaintiffs] to act upon the representation; and (4) [Plaintiffs] actually and justifiably relied upon the representation and thereby suffered injury."

*Ernst & Young, L.L.P. v. Pac. Mut. Life Ins. Co.*, 51 S.W.3d 573, 577 (Tex. 2001). "The fourth element has two requirements: the plaintiff must show that it actually relied on the defendant's representations and, also, that such reliance was justifiable." *JPMorgan Chase Bank, N.A. v. Orca Assets G.P., L.L.C.*, 546 S.W.3d 648, 653 (Tex. 2018). To adequately plead fraud in federal court, Federal Rule of Civil Procedure 9(b) imposes "heightened pleading requirements" that to "alleg[e] fraud or mistake, a party must state *with particularity* the circumstances constituting fraud or mistake." *Pace v. Cirrus Design Corp.*, 93 F.4th 879, 889 (5th Cir. 2024) (quoting FED. R. CIV. P. 9(b)) (emphasis added). When a party's "misrepresentation claims are based on

alleged false statements, he must satisfy Rule 9(b)'s heightened pleading." *Id.* Courts have required parties to plead the circumstances constituting fraud to include the "who, what, when, where, and how of the fraud or misrepresentation." *Id.* at 890 (internal quotation marks and citations omitted).

Plaintiffs' Amended Complaint falls below the heightened pleading standard for fraud in federal courts. Plaintiffs' cause of action for "COMMON LAW FRAUD (TEXAS)" is essentially a bare recital of the elements of a fraud claim with an incorporation by reference to "Paragraphs six through fifteen." (Dkt. #14 at pp. 10–11). Paragraphs 6–9 of Plaintiffs' Amended Complaint are jurisdiction and venue statements (Dkt. #14 at pp. 2–3). Paragraphs 10–15 relate, in relevant part, to the following: (1) the background facts about the mechanical issues the Vehicle experienced while Plaintiff Lori Smith was driving in Mississippi; (2) the towing of the Vehicle to and from the Facility and Plaintiff Lori Smith's mother's home in Columbus, Mississippi; (3) the trouble shooting of the multiple mechanical issues discovered during the first and second repair attempts between April 2021 and June 2021; (4) the alleged representations from the Facility that the Vehicle would be returned to Plaintiffs in Texas under the Jaguar Reunite Program; (5) Plaintiffs making multiple requests for the car to be transported to Texas and requests for updates on the status of the repair; (6) the Texas Department of Motor Vehicles claim filed in June 2021; and (7) Plaintiffs' continued payments for the Vehicle while it remained in the possession of the Facility (Dkt. #14 at pp. 3–8). None of paragraphs 6–15 plead with any particularity the who, what, when, where, and how of the federal fraud claim's heightened pleading requirements.

It is not until paragraph 19 that Plaintiffs set out the alleged false misrepresentations (Dkt. #14 at pp. 8–9). Paragraph 19 alleges the following statements constitute fraudulent misrepresentations:

a. Almost two years since the reported incident, and no action has been completed by Defendant to remedy the problems.

b. False assertions were made by Defendant and its representatives (Joel Spanick, Eugene Stewart, and Dan Germond) during the Texas Department of Motor Vehicles investigation/administrative hearing regarding their alleged response to inquiries, actions, and notices to Plaintiffs which delayed a resolution of this claim.

c. False assertions were made by Urgently that Defendant would return the Vehicle to Texas under the Jaguar Reunite Program.

d. False assertions were made by Defendant and its representatives (Joel Spanick, Eugene Stewart, and Dan Germond) during the Texas Department of Motor Vehicles investigation/administrative hearing that the dealership made many attempts to contact Plaintiffs by phone to discuss and address their concerns.

e. False assertions were made by Defendant and its representatives (Joel Spanick, Eugene Stewart, and Dan Germond) during the Texas Department of Motor Vehicles investigation/administrative hearing that the vehicle was fixed, and the Plaintiffs had been notified.

f. False assertions were made by Defendant and its representatives (Joel Spanick, Eugene Stewart, and Dan Germond) during the Texas Department of Motor Vehicles investigation/administrative hearing that the Vehicle was not returned because Plaintiffs notified the dealer not to return it since Defendant would be buying back the vehicle.

(Dkt. #14 at pp. 8–9). The foregoing allegations of fraudulent misrepresentations do not meet the heightened pleading requirements (who, what, when, where, and how) for federal fraud claims.

To begin, the first allegation, a., does not allege any statement and therefore cannot constitute a fraudulent misrepresentation. Next, the allegation in c. refers to "[f]alse assertions . . . made by Urgently," a roadside assistance company. Defendant asserts Urgently is an independently owned company and not an agent of Defendant (Dkt. #29 at p. 25). Thus, this allegation cannot be used to support a fraud claim against Defendant. Next, in b., d., e., and f., Plaintiffs recount multiple allegedly false misrepresentations made "during the Texas Department of Motor Vehicles investigation/administrative hearing" by Joel Spanick, Eugene

Stewart, and Dan Germond. Joel Spanick is a Service Advisor for the Facility, and Dan Germond is a Service Director for the Facility (Dkt. #30, Exhibit C). As addressed, *infra.*, Mr. Spanick and Mr. Germond are not agents or representatives of Defendant. As such, any reliance on the alleged misrepresentations of Mr. Spanick and Mr. Germond are not attributable to Defendant and cannot be used to support Plaintiffs' fraud claim against Defendant.

The only agent or representative of Defendant in these allegations is Eugene Stewart, who represented Defendant during Plaintiffs' Lemon Law hearings (Dkt. #29 at p. 24). In Texas, courts recognize the so-called judicial-proceedings privilege. *Landry's Inc. v. Animal Legal Def. Fund*, 631 S.W.3d 40, 46 (Tex. 2021). The privilege applies in judicial and quasi-judicial proceedings. *Blasko v. Miller*, 678 F. Supp. 3d 832, 848–49 (N.D. Tex. 2023). "The judicial-proceedings privilege is an absolute privilege that normally covers 'any statement made by the judge, jurors, counsel, parties, or witnesses, and attaches to all aspects of the proceedings, including statements made in open court, pre-trial hearings, depositions, affidavits and any of the pleadings or other papers in the case.'" *Id.* at 849 (citing *Landry's*, 631 S.W.3d at 46). "Although commonly applied in defamation cases, the privilege prohibits 'any tort litigation based on the content of the communication' at issue." *Landry's*, 631 S.W.3d at 46 (quoting *Collins v. Zolnier*, No. 09-17-00418-CV, 2019 WL 2292333, at *3 (Tex. App.—Beaumont May 30, 2019)). The above four instances of fraudulent misrepresentations that Plaintiffs allege are attributable to Mr. Stewart, a representative of Defendant, were each made during the Lemon Law proceedings. Because Plaintiffs' cause of action for fraud is "based on the content of the communication" during the Lemon Law proceedings, the judicial-proceedings privilege applies.

As Plaintiffs' allegations do not properly allege common law fraud, it follows that their summary judgment evidence does not establish fraud. Plaintiffs did not provide any evidence to

demonstrate Plaintiffs' reliance on the allegedly false misrepresentations. Plaintiffs also did not provide evidence to demonstrate that Defendant or its representatives knew the statements were false or made the statements recklessly as a positive assertion without any knowledge of their truth. Finally, Defendant's statements during the Lemon Law proceedings are privileged from any tort litigation under Texas' judicial-proceedings privilege. Accordingly, Plaintiffs have failed to plead with any particularity how Defendant or its representatives made fraudulent misrepresentations. Likewise, Plaintiffs failed to offer summary judgment evidence in support of their fraud claims. Therefore, the court recommends that Defendant is entitled to summary judgment on Plaintiffs' fraud claims.

### G.  Monetary Damages

Plaintiffs seek economic and actual damages in the amount of $138,643.42 for the following: "(a) Repurchase of the Vehicle ($59,943.42); (b) Loss of Use ($60,000.00); (c) Rental cars, and other travel expenses ($11,300.00); and (d) Lost wages (40 hours @ 185.00/hour ($7,400.00))." (Dkt. #14 at p. 12). Plaintiffs also seek damages for mental anguish in an amount not less than $250,000.00 (Dkt. #14 at pp. 12–13). Defendant argues that, under the explicit language of the express warranty, Plaintiffs are not entitled to any of the economic or actual damages they seek, nor are Plaintiffs entitled to damages for mental anguish (Dkt. #29 at pp. 20–23).

#### 1.  Limitation of Remedies/Repurchase of the Vehicle

As explained herein, Texas has adopted the UCC into its Business and Commerce Code. Texas allows contractual modification or limitation of remedies through § 2.719 of the Texas Business and Commerce Code. Section 2.719(a)(1) states:

> (1) the agreement may provide for remedies in addition to or in substitution for those provided in this chapter and *may limit or alter the measure of damages*

*recoverable* under this chapter, as by limiting the buyer's remedies to return of the goods and repayment of the price *or to repair and replacement of non-conforming goods or parts*."

TEX. BUS. & COM. CODE § 2.719(a)(1) (emphasis added). Section 2.719(a) also provides that "resort to a remedy as provided is optional unless the remedy is expressly agreed to be exclusive, in which case *it is the sole remedy*." TEX. BUS. & COM. CODE § 2.719(a)(2) (emphasis added). Such "[l]imited and exclusive remedy provisions are enforceable under Texas law." *Pleasant Grove Indep. Sch. Dist. v. FieldTurf USA, Inc.*, 648 S.W.3d 608, 613–14 (Tex. App.—Texarkana July 1, 2022) (collecting cases).

In relevant part, the Vehicle's warranty states, in bold typeface: "Limitation of Remedies[:] Under the warranty, it is agreed that the sole exclusive remedy against Jaguar and its authorized retailers shall be for the repair or replacement of defective parts as provided herein." (Dkt. #29, Exhibit B at p. 8). This provision is similar to that in *Pleasant Grove*, which states, in relevant part: "This warranty is limited to the remedies of repair or replacement, which shall constitute the exclusive remedies available under this warranty." 648 S.W.3d at 614. Plaintiffs argue that limitations on remedies such as that contained in the express warranty are typically considered invalid under § 17.42 of the DTPA (Dkt. #30 at pp 21–22). Such argument is generally true where the claims are based on false, misleading, or deceptive acts or practices in the so-called laundry list under DTPA's § 17.42 or unconscionable actions under DTPA's § 17.45(5). TEX. BUS. & COM. CODE §§ 17.42, 17.45, 17.46. However, as discussed, *supra*, summary judgment is proper on Plaintiffs' claim that Defendant engaged in false, misleading, or deceptive acts or practices under § 17.42. Thus, such a limitation on remedies is not invalid. Under the conspicuous terms of the express warranty, Plaintiffs' remedies for breach of warranty are limited to repair or replacement. Accordingly, Plaintiffs are not entitled to the repurchase of

the Vehicle, a remedy that is excluded under the terms of the warranty, and the court recommends granting summary judgment on any claim for such damages.

### 2. Consequential Damages

Additionally, the express warranty limits consequential damages in two separate sections. The first relevant section states, in bold typeface and all-caps: "Jaguar does not accept responsibility under any of the warranties in the Passport to Service for any consequential damage or commercial loss to the owner, or any incidental expenses, loss of time, or inconvenience." (Dkt. #29, Exhibit B at p. 8). The second relevant section states, in bold typeface: "Jaguar and your retailer are not responsible for any time that you lose, for any inconvenience you might be caused, for the loss of your transportation, or for any other incidental or consequential damages you may have." (Dkt. #29, Exhibit B at p. 9).

Because the express warranty explicitly excludes consequential damages, Plaintiffs are not entitled to recover monetary damages for loss of use or lost wages. The only consequential damages Plaintiffs may be entitled to recover are some, if not all, of their rental cars and other travel expenses. Any such travel expenses will be limited to the terms of the trip interruption benefits provision, which, as recommended, *supra*, should survive summary judgment. However, the court recommends that Defendant is entitled to summary judgment on the remaining consequential damages Plaintiffs seek.

### 3. Damages for Mental Anguish

Plaintiffs are seeking not less than $250,000.00 for the "high degree of mental pain and distress" they allegedly suffered (Dkt. #14 at pp 12–13). Plaintiffs argue that they are entitled to recover under Subsection (b) of Section 17.50 because Defendant's actions were done "knowingly," which would entitle Plaintiffs to "recover damages for mental anguish, as found by

the trier of fact, and the trier of fact may award not more than three times the amount of economic damages." Tᴇx. Bᴜs. & Cᴏᴍ. Cᴏᴅᴇ § 17.50(b)(1). Section 17.50 of the DTPA provides the following consumer relief:

> (a) consumer may maintain an action where any of the following constitute a producing cause of economic damages or damages for mental anguish:
> (1) the use or employment by any person of a false, misleading, or deceptive act or practice that is:
> (A) specifically enumerated in a subdivision of Subsection (b) of Section 17.46 of this subchapter; and
> (B) relied on by a consumer to the consumer's detriment.

Tᴇx. Bᴜs & Cᴏᴍ. Cᴏᴅᴇ § 17.50(a)(1)(A)–(B). Subsection (b) of Section 17.46 includes a laundry list of actions, none of which Plaintiffs have brought in this lawsuit. As discussed, *supra*, there is no evidence that Defendant engaged in false, misleading, or deceptive acts or practices, let alone knowingly engaged in such action.

Additionally, Defendant challenged Plaintiffs' claim for mental anguish in its Motion for Summary Judgment (Dkt. #29 at p. 20, n.7). Tellingly, Plaintiffs do not contradict Defendant's position, but rather argue that the consequential damages limitation provision is unenforceable (Dkt. #30 at pp. 21–22). However, as discussed, *supra*, this limitation in the warranty is enforceable. Thus, having been challenged by Defendant and not supported by evidence to the contrary from Plaintiffs, there is no genuine dispute as to any material fact that Plaintiffs may recover mental anguish damages based on the allegation that Defendant knowingly engaged in false, misleading, or deceptive acts or practices. Accordingly, Defendant is entitled to summary judgment on Plaintiffs' claims for mental anguish damages.

### H.  Agency Law Theory

While not a cause of action, Plaintiffs raise the issue of agency law in their Amended Complaint (Dkt. #14 at p. 12). Plaintiffs allege, in total, that

> [a]t and during the time of the acts and/or omissions complained of herein, any acts and/or omissions committed by an agent, representative, or employee of Jaguar occurred within the scope of the actual or apparent authority of such person on behalf of Jaguar. As such, Jaguar is therefore liable to Plaintiffs for the acts and/or omissions of any such agent, representative, or employee, complained of herein by virtue of such agency relationship.

(Dkt. #14 at p. 12). Meanwhile, Defendant argues that "[m]ost of Plaintiffs' wrath in this case is directed toward parties who they have not even sued. Plaintiffs complain, for example, about employees at [the Facility] and a company called Urgently. These are independently owned companies, and neither one was an agent of [Defendant]." (Dkt. #29 at p. 25).

The express warranty for the Vehicle states, "This New Vehicle Limited Warranty is the only express warranty applicable to your vehicle. Jaguar neither assumes, *nor authorizes anyone to assume for it*, any other obligation or liability in connection with this warranty." (Dkt. #29, Exhibit B at p. 8) (emphasis added). Not only does the warranty explain that no one is authorized to act as an agent for Defendant, but as Defendant argues, the law prohibits such agency action. *See Coffey v. Fort Wayne Pools, Inc.*, 24 F. Supp. 2d 671, 679 (N.D. Tex. 1988) ("Under this rationale, a GM dealership would be an agent of GM because GM exercised control over the dealership by limiting the dealers supply of vehicles to those which GM manufactured. However, it is well-settled that dealers in new automobiles are purchasers from the manufacturer and not agents of the manufacturer."). Thus, the Facility's employees and the repair work performed at the Facility were not actions that can be imputed to Defendant based on the theory of agency law.

Additionally, Alabama and Texas law each prohibit distributors such as Defendant from controlling retailers' work regarding warranties. The Texas Occupations Code provides that "a manufacturer or distributor may not directly or indirectly own an interest in, operate or control, or act in the capacity of a franchised dealer or dealership for the same type of motor vehicle that

REPORT AND RECOMMENDATION – Page 29

the manufacturer manufactures or distributes or the distributor distributes." TEX. OCC. CODE § 2301.476(c) (cleaned up). In Alabama, where the Facility is located, the law provides that it

> constitutes [an] unfair and deceptive trade practice[] . . . for any manufacturer . . . to own an interest in a new motor vehicle dealership, to operate or control a dealership, to make direct sales or leases of new motor vehicles to the public in Alabama, or to own, operate, or control a facility for performance of motor vehicle warranty or repair service work.

ALA. CODE § 8-20-4(3)(s) (cleaned up). Thus, Texas and Alabama law prohibits Defendant from forming a principal-agent relationship with the Facility.

Further, Defendant has a franchise agreement with the Facility and other dealerships that expressly excludes a principal-agent relationship. An excerpt from the Jaguar Land Rover North America, LLC Dealer Agreement Standard Terms and Conditions provides the following:

> **Independent Contractor** 14.1 Dealer, for all purposes of this Agreement, is an independent contractor and *Dealer is not the agent or representative of Company or its affiliates for any purpose*. No other contractual relationship exists between Dealer and Company and Dealer has no contractual relationship with Manufacturer. Dealer is not granted any express or implied right or authority to assume or create any obligation on behalf of or in the name of Company or to bind Company in any manner whatsoever.

(Dkt. #29, Exhibit N at p. 13) (emphasis added). Thus, the unambiguous terms of the franchise agreement with Defendant and the Facility clearly establish that there is no principal-agent relationship.

The foregoing establishes that, by law and by agreement, there is no actual authority for anyone to act as an agent for Defendant. Plaintiffs, then, rely on the theory of apparent authority (Dkt. #30 at pp. 19–21). The case law Plaintiffs provided states that "a court examines the conduct of the principal and the reasonableness of the third party's assumptions about authority." *Sanders v. Total Heat & Air, Inc.*, 248 S.W.3d 907, 913 (Tex. App.—Dallas Mar. 31, 2008). Plaintiffs argue that apparent authority is established by their reasonable belief that the Facility and Jaguar Assistance Center had authority to act as agents of Defendant and through the

REPORT AND RECOMMENDATION – Page 30

statements of Defendant (Dkt. #30 at pp. 19–21). Plaintiffs rely on the language of the warranty that tells consumers to utilize "authorized retailers . . . to repair or replace defective parts." (Dkt. #30, Exhibit F at p. 8). Plaintiffs also rely on the language of the warranty that directs consumers to use a service called Jaguar Assistance Center (Dkt. #30 at pp. 20–21).

The court agrees with Defendant that, rather than "clothe [Jaguar] Land Rover retailers and the Jaguar Assistance Center with indicia of authority" to bind Defendant to an obligation or liability (Dkt. #30 at p. 20), the provisions cited by Plaintiffs merely "(a) confirm that retailers perform warranty work on covered vehicles; and (b) inform customers of the Customer Assistance Program." Nowhere in the warranty does the language state that retailers or the Customer Assistance Program have the authority to bind Defendant to any obligation. Indeed, the warranty has conspicuous language to the contrary, stating that no one has the authority to bind Defendant to any obligation or liability. Moreover, any such principal-agency relationship between Defendant and the Facility would run contrary to the law. Thus, any alleged action that Plaintiffs impute to Defendant based on an agency theory is unfounded.

### CONCLUSION AND RECOMMENDATION

For the foregoing reasons, the court recommends that Defendant's Motion for Summary Judgment (Dkt. #29) be **GRANTED IN PART** and **DENIED IN PART** as set forth herein. The court further recommends that Defendant's Motion for Judgment on the Pleadings (Dkt. #21) be **DENIED AS MOOT**. Any request for relief not addressed by this report and recommendation should be denied as **MOOT**.

Within fourteen (14) days after service of the magistrate judge's report, any party must serve and file specific written objections to the findings and recommendations of the magistrate judge. 28 U.S.C. § 636(b)(1)(C). In order to be specific, an objection must identify the specific

finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's report and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific.

Failure to file specific, written objections will bar the party from appealing the unobjected-to factual findings and legal conclusions of the magistrate judge that are accepted by the district court, except upon grounds of plain error, provided that the party has been served with notice that such consequences will result from a failure to object. *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996) (en banc), *superseded by statute on other grounds*, 28 U.S.C. § 636(b)(1) (extending the time to file objections from ten to fourteen days).

**SIGNED this 3rd day of July, 2024.**

AILEEN GOLDMAN DURRETT
UNITED STATES MAGISTRATE JUDGE